**GUARANTY SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**ULTIMATE SAVINGS BANK, F.S.B., acting by its receiver Federal Deposit Insurance Corp., as manager for FSLIC Resolution Fund, Defendant.**

**Civ. A. No. 88–0064–C.**

United States District Court,
W.D. Virginia,
Charlottesville Division.

May 18, 1990.

Bruce C. Phillips, Lloyd T. Smith, Jr., Smith, Taggart, Gibson & Albfo, Charlottesville, Va., for Guaranty Sav. and Loan Ass'n.

Nancy L. Lowndes, Eliot Norman, Thompson & McMullan, Richmond, Va., for FSLIC.

## MEMORANDUM OPINION

MICHAEL, District Judge.

Plaintiff in this case seeks to recover funds which it alleges are owing to it under a loan participation agreement entered into by the parties. This action was originally filed in the Circuit Court for the City of Charlottesville and was removed to this court by the defendant pursuant to 12 U.S.C. § 1730(k)(1)(C). This court has jurisdiction under 12 U.S.C. § 1730(k)(1)(B) and 28 U.S.C. § 1331.[1]

---

1. Until recently there was some debate over whether § 1730(k)(1)(B) actually gave federal District Courts jurisdiction over cases involving F.S.L.I.C. acting as the receiver of a federal savings and loan in light of the prohibition contained in 12 U.S.C. § 1464(d)(6)(C). However, in *Coit Independence Joint Venture v. F.S.L. I.C.*, 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989), the Supreme Court squarely held that this court does have jurisdiction over this type of action.

Subsequent to the decision in *Coit,* and after this case was removed from state court, the entirety of 12 U.S.C. § 1730 was repealed by Pub.L. 101–73, Title IV, § 407, effective August 9, 1989, as part of the ongoing legislative response to the savings and loan crisis. However, the repeal of § 1730 does not appear to this court to divest it of jurisdiction. Cases concerning federally chartered banks and savings institutions have long been held to be matters of federal law, a holding implicit in *Coit.* The repeal of § 1730, which made this holding explicit, would not appear to detract from its truth. Thus even if the court no longer has jurisdiction under § 1730 it still has it under 28 U.S.C. § 1331.

This case was tried to the court sitting without a jury on February 15, 1990. At trial, plaintiff put on witnesses and both parties moved numerous exhibits into evidence by stipulation. At the close of plaintiff's case-in-chief the defendant moved for a directed verdict which motion was denied by the court as contested legal issues remained for decision. After the denial of the motion for directed verdict the defendant rested without putting on any witnesses. The court requested, and has received, post-trial memoranda. This case is now ready for disposition. Before making specific findings of fact the court will set forth a brief summary of the events which transpired prior to the filing of this case in an effort to make the factual findings more easily understandable.

The plaintiff, and several other parties, entered into loan participation agreements with the defendant. Cardinal, in turn, made a loan to an entity known as the Area Corporation to finance the conversion of property in Richmond previously owned by the Little Sisters of the Poor, and used as a convent, into upscale properties to be known as the Warsaw Condominiums. For a certain period of time the project and the loan went smoothly, however, for a number of reasons, the project eventually foundered and Cardinal was forced to foreclose. At foreclosure, Cardinal was the high bidder and received the property; it subsequently sold off the remaining condominiums. At the time of the foreclosure Cardinal also obtained a deficiency note from Area Corporation. It is undisputed that Guaranty did not receive all of the funds to which it was entitled under the loan participation agreements. At issue in this suit is how much Cardinal owes to Guaranty under those agreements, and whether Guaranty is a secured or unsecured creditor respecting any such amount.

### I

Pursuant to Rule 52(a), Fed.R.Civ.P., the court finds the following facts.

The plaintiff, Guaranty Savings and Loan Association ("Guaranty"), is a federally chartered savings and loan institution with its principal place of business in Charlottesville, Virginia. The defendant was originally Cardinal Savings and Loan Association ("Cardinal"), a federally chartered savings and loan institution with its principal place of business in Richmond, Virginia; subsequently, Cardinal changed its name to Ultimate Savings Bank, F.S.B. On September 16, 1988 the Federal Home Loan Bank Board, then the controlling arm of the Federal Savings and Loan Insurance Corporation ("FSLIC"), declared Ultimate insolvent and placed it in receivership. The FSLIC was appointed the sole receiver. On August 9, 1989, the FSLIC was abolished by act of Congress and replaced by the FSLIC Resolution Fund; this fund is managed by the Federal Deposit Insurance Corporation ("FDIC"). Thus the FDIC has succeeded the FSLIC as the receiver for Ultimate.[2]

On June 24, 1982, Guaranty, by its President Michael H. McKeever, and Cardinal, by its President Mayo C. Harlow, signed a document entitled "Loan Participation Agreement" (the "Participation Agreement") which set forth, in a general manner, terms which would apply to future sales of loan participation agreements between the parties and Cardinal's responsibilities for servicing such agreements.

On July 21, 1982, Cardinal and the Area Corporation ("Area") signed a "Construction Loan Agreement" whereby Cardinal agreed to lend to Area the total sum of $4,250,000.00 to finance the construction of the Warsaw Condominiums. This loan was secured by a deed of trust relating to the subject property and a guaranty, both of which were signed by the principals of Area and their spouses: Allen M. and Mary Jo Weaver, Hugh and Elizabeth M. Shull, John R. and Lee H. Arwood. The loan between Cardinal and Area was structured so that as condominium units were sold off Area would make principal payments to Cardinal.

---

**2.** Unless further distinction is necessary, the Court will refer to the defendant, in any of its incarnations, as Cardinal.

The loan by Cardinal to Area was made pursuant to the participation agreements signed by Guaranty and others. Without these participation agreements Cardinal would have been unable to make the loan to Area since federal banking regulations prohibited it from making a loan of this size to a single borrower.

On July 22, 1982, Cardinal and Guaranty signed a document entitled "Construction Participation and Service Agreement" (the "Service Agreement").[3] Under this agreement Guaranty purchased an undivided 11.7647% interest, equivalent to $500,000.00, in the loan to Area. Under the Service Agreement Guaranty was not required to fund its share in full immediately, but rather paid out portions of its obligation to Cardinal as "draws" were filed by Area. It is undisputed, and the court so finds, that Guaranty paid out its full $500,000.00 obligation under this agreement. The parties agreed that this document would be construed under the laws of Virginia. Similar agreements were entered into between Cardinal and Atlantic Permanent Federal Savings and Loan Association, and Cardinal and Security Savings and Loan. These other agreements differed from that at issue in this case only in terms of the percentage of the participation interest sold.

Paragraph 4 of the Service Agreement required Cardinal to pay over to Guaranty the portion of interest owing to Guaranty "as and when interest on the Loan [was] collected by [Cardinal]." It further required Cardinal to pay to Guaranty "the Percentage of all other payments, avails and proceeds received by the Lender from any source pertaining to the Loan." This percentage payment system applied to amounts collected both before and after any foreclosure.

Between August 1982 and January 1985 Cardinal made $127,334.49 in interest payments to Guaranty. No evidence was introduced to show that Cardinal collected any interest payments from Area from which Guaranty did not receive its proportionate share. Additionally, no evidence was introduced to show that Cardinal collected any interest from Area after January of 1985, and the court specifically finds that none was collected after that date.

Between December 1983 and March 1986 Cardinal made $375,607.63 in principal payments to Guaranty, leaving a shortfall in principal of $124,392.37.

Cardinal does not dispute, and the court so finds, that it collected $85,000.00 in lender points on the loan. Cardinal also does not dispute, and the court so finds, that Guaranty was not paid its percentage of these lender points, totalling $10,000.00, as required by paragraph 4 of the Service Agreement.

In May of 1986 Cardinal foreclosed on the loan to Area. At the foreclosure sale on May 16, 1986, Cardinal was the high bidder at $763,214.00, and took in the property which secured the loan. No money was taken in at foreclosure.

Between June of 1986 and February of 1987 Cardinal sold off the seven remaining condominiums for a total of $894,500.00; in payment for the condominiums Cardinal took in $263,675.00 in cash and $630,825.00 in notes evidencing "loans to facilitate" made to the various purchasers. The sale of the condominiums yielded $804,168.42 in net proceeds after expenses. Under the Service Agreement Guaranty was entitled to $94,608.00 from these net proceeds as payment against principal.

In October of 1986 Guaranty received a payment from Cardinal of $31,000.00, denominated a payment of principal. It is undisputed, and the court so finds, that $63,608.00, the amount of principal owing to Guaranty from the proceeds of the sale of the condominiums less the payment of the $31,000.00, was never paid over to Guaranty.

Between June and October of 1986, the only other remaining participant in the loan, Atlantic Permanent Federal Savings

---

**3.** The document was actually signed sometime after August 5, 1982, but was made effective retroactive to July 22, 1982.

and Loan Association, received two principal payments totalling $675,000.00.

Cardinal's high bid at foreclosure was less than the amount still owing to Cardinal from Area. In November of 1986 Cardinal and the principals of Area entered into a deficiency note with a face value of $420,-000.00. Cardinal was ultimately able to collect $126,215.26 under this note. Guaranty's *pro rata* share of this amount was $8,950.55.[4] It is undisputed, and the court so finds, that this sum was never paid to Guaranty.

## II

At its core, this is a contract case. The parties entered into written agreements setting forth their rights and obligations regarding a particular transaction and they are now disputing the nature of those rights and obligations and whether they have been met by the respective parties. This basic contract case has been complicated by the superimposition of the receivership of the defendant; while the receivership does not alter the basic analysis of the contract dispute or the measure of damages, it may complicate the plaintiff's access to such damages.

To a certain extent, damages are not contested. While FDIC, as receiver, offers no explanation as to why, it admits that various sums were collected by Cardinal to which Guaranty was entitled to a proportionate share, and it admits that Guaranty was not paid its share. While Guaranty does not dispute that it is owed a substantial sum, it would calculate its damages in a different fashion than does the defendant. A related contested issue concerns the status of Guaranty's claim against Cardinal and introduces equitable arguments into this case. Guaranty argues that Cardinal owed fiduciary obligations to Guaranty under the present facts, and that trust property can be traced from Cardinal into the hands of FDIC. Consequently, Guaranty argues, it is a secured creditor entitled to

full payment of the debt. FDIC argues that no fiduciary obligation existed, that even if it did, no trust property remains under its control, and consequently that Guaranty is an unsecured creditor entitled only to a *pro rata* payment on its debt.

### A. *Guaranty's Status*

In this case Guaranty argues that it is a secured creditor entitled to full payment of its claims from the receivership estate. In the overwhelming majority of cases where a party argues that it is a secured creditor the party has a lien against specific property of the defendant. Guaranty does not assert that it is secured in this traditional sense, nor does Guaranty assert that it is secured directly by the Participation or Service Agreements. *See Hibernia Nat'l Bank v. F.D.I.C.*, 733 F.2d 1403, 1407 (10th Cir.1984) (In a participation "[t]he lead [lender] is the only secured party. The 'participants' can look solely to the lead for satisfaction of their claims because they are not themselves creditors of the borrowers and cannot assert creditor claims against the borrowers.") Instead Guaranty argues that a fiduciary relationship existed between it and Cardinal and that the *res* of the resulting trust can be traced in to the loans Cardinal made to the purchasers of the foreclosed condominiums. The fiduciary relationship, coupled with the tracing of trust assets into property in the hands of the receiver, would give Guaranty secured status. *Hibernia Nat'l Bank*, 733 F.2d at 1407; *Lifsey v. Goodyear Tire & Rubber Co., Inc.*, 67 F.2d 82, 83 (4th Cir. 1933).

For the source of the fiduciary relationship Guaranty points to the Participation Agreement. As a general rule, contracts between sophisticated commercial entities such as banks, dealing at arms length, as the present parties did, do not create fiduciary obligations. *Northern Trust Co. v. F.D.I.C.*, 619 F.Supp. 1340, 1344 (D.Okla.1985). This is also true as to

---

**4.** This represents 7.09% of the amount collected under the deficiency note. While Guaranty's share under the Service Agreement was 11.7647%, had Guaranty received the principal payment it was due from the proceeds of the condominium sales it would have retained only a 7.09% share at that point.

loan participation agreements between banks. *Id.* However, where the language of a participation agreement is sufficiently explicit, such a document may give rise to fiduciary obligations. *See Women's Fed. Sav. and Loan of Cleveland v. Nevada Nat'l Bank,* 811 F.2d 1255, 1258 (9th Cir. 1987); *Seattle–First Nat'l Bank v. F.D. I.C.,* 619 F.Supp. 1351, 1355 (D.Okla.1985). Thus, the determinative factor is the specific language of the contract.

As drafted, the Participation Agreement appears to the court to give rise to a fiduciary relationship. Paragraph VIII of that document states

It is agreed that Seller and Buyer are not partners or joint venturers, and that *Seller is not to act as agent for the Buyer, but is to act in all matters hereunder for the Buyer as an independent contractor, but also as a trustee with fiduciary duties to administer the loans hereunder....* It is agreed that the exclusive right to decide how such loans shall be serviced and what to do and how to do it ... when to foreclose ... whether or not to buy in at a foreclosure sale ... and how to administer any foreclosed ... real estate ... *is hereby vested in the Seller as trustee for all the owners of participation agreements hereunder.* (Emphasis added.)

In addition, references to Cardinal's obligations as a "trustee" are made in paragraphs IV, IX, and X of the Participation Agreement. While sophisticated commercial entities generally do not create fiduciary relationships, they are not precluded from doing so if they desire. The language of the Participation Agreement evinces just such an intention and the court concludes that the Participation Agreement created a fiduciary relationship between Guaranty and Cardinal.[5] The subsequently signed

Service Agreement, however, is a horse of a different color.

This document, dated July 22, 1982, is a standard business document making no reference to the existence of any sort of fiduciary relationship between the parties. While paragraph 13 of the Service Agreement indicates Cardinal shall service the loan as an "independent contractor," it contains no other language similar to that in the Participation Agreement. Following the rationale of *Northern Trust,* no fiduciary obligation exists under the terms of this document. The court concludes that, standing alone, the Service Agreement creates no fiduciary relationship between the signers.

The crucial issue in this case thus becomes which of the two documents signed by the parties, the Participation Agreement or the Service Agreement, is controlling. While little attention was given to this matter in the parties' briefs, it is clear that Guaranty believes both documents constitute operative agreements and must consequently be interpreted together. Cardinal contends that the second document sets forth the entire agreement of the parties and that the first is no longer operative.[6]

Both the Participation Agreement and the Service Agreement contain standard integration clauses stating

This agreement contains the entire agreement between the parties hereto and cannot be modified in any respect except by an agreement in writing executed by all parties.

In terms of indicating which document is controlling these clauses are not determinative since they both contemplate that changes may be made when in writing and signed by both parties. Thus both the Participation and Service Agreements would be acceptable modifications of each other.[7]

---

**5.** Compare the language of the Participation Agreement quoted above with that of the agreement in *Northern Trust,* 619 F.Supp. at 1346, which the court found did not create fiduciary obligations.

**6.** At trial, the court allowed the Participation Agreement into evidence, over defendant's objection, as a cursory review revealed that the

two documents appeared to deal with different subjects.

**7.** Integration clauses are traditionally designed to invoke the protection of the Parol Evidence Rule which prevents the consideration of extraneous *oral* material.

Both of these documents can stand alone as contracts: each is supported by consideration, sufficiently clear as to relevant details, and capable of execution. On its face, the current factual pattern presents the not unusual situation of two contracts entered into between the same two commercial entities at different times. Before abrogating a contract duly agreed to between competent businessmen the court must look to something more than simply the fact that one was signed at a later date. Cardinal argues that the language in the Service Agreement to the effect that it states the "entire agreement" between the parties is all the court needs to dispose of the matter. However, this too, is insufficient.

Corporations that deal with each other over a protracted period frequently enter into a number of agreements, each of which routinely contains integration clauses similar to those at issue here stating that the documents represent the entire agreement of the parties. Obviously, despite the presence of this language, each time a new contract is signed it does not vitiate every other contract ever entered into between the same parties. Logically, this could occur only if the subject matter of different contracts overlaps; to determine whether the subject matter is the same the court must look to the actual language of the documents. Such an examination in this case reveals that the subject of the two contracts, while related, is different.

The Participation Agreement is a general document; it states that the parties will engage in participation agreements in the future, about which no details are currently known, and sets out some general ground rules for those agreements. The Participation Agreement specifically assumes that the details of subsequent loan participations will have to be enumerated at a later date since at the time of signing they will be unknowable. Consequently, the Participation Agreement assumes that future documents like the Service Agree-

ment will be required.[8] Neither of the present agreements makes direct reference to the other, however, as noted above, the Participation Agreement contemplates that documents such as the Service Agreement will be signed; thus the Service Agreement's existence is in no way inconsistent with the continued existence of the earlier contract. And, on the other hand, the Service Agreement does not state that the Participation Agreement, the signing of which must have been fresh in the minds of all parties, is to be invalidated.

For an additional reason it is not logical to assume that the signing of the Service Agreement extinguished the Participation Agreement. The Participation Agreement, as noted above, on its face contemplates a number of future loan participation agreements. The existence of a document such as the Participation Agreement would be a necessary prerequisite to Cardinal's making future loans under applicable federal regulations, and as the facts of this case show, it is clear that Cardinal makes such loans before the more specific Service Agreements are ever signed. Since the services of the Participation Agreement would be required repeatedly over time it does not make sense to assume that the integration clause in the Service Agreement extinguished it.

Since the Participation Agreement continues in force even after the signing of later service agreements it is clear that its obligations continue in effect unless changed by a subsequent agreement. This is true because one of the basic rules of contract interpretation requires a court to construe the language of two or more contracts in such a fashion as to render the language of each meaningful, if such an interpretation is possible. Since the court concludes that both documents are operative agreements, coexisting and both binding at the same time, it must seek to interpret them together. The Participation Agreement sets forth the general parameters of what is expected to be an ongoing relationship between the parties. The Ser-

---

**8.** It is important to note at this juncture that the Service Agreement comports in all respects with the general guidelines established in the Participation Agreement.

vice Agreement sets forth the economic details of specific parts of the ongoing relationship. The parties would look to the Service Agreement to find out precisely what percentage of a particular loan the buyer owned, who the borrower was, what security existed, etc. On the other hand, unless the Service Agreement explicitly changed it, the parties would look to the Participation Agreement to determine the basic nature of their relationship.

As discussed above, the Participation Agreement envisions a fiduciary relationship between Cardinal and Guaranty. Guaranty was at a distance from the transaction, its rights were all derivative of those of Cardinal and it could expect to look to Cardinal to guard its rights zealously. The Service Agreement makes no reference to the nature of the relationship between the parties. The court concludes that such a relationship continued to exist, within the context of the financial specifics of the Service Agreement, and in so doing the court gives meaning to both of the documents while detracting from neither.

The existence of the fiduciary relationship and the resulting trust is not sufficient, by itself, to render Guaranty a secured creditor; Guaranty must also trace trust property into the hands of the receiver. *Lifsey*, 67 F.2d at 83. Guaranty argues that it can trace trust assets into the notes which Cardinal took back from the ultimate purchasers of the condominiums remaining after foreclosure. While Cardinal admits that Guaranty is entitled to its share of the net proceeds of those condominium sales, it contends that the loans made to the purchasers are not proceeds of those sales, and consequently not subject to the impression of any trust.

▆▆ Before addressing the tracing issue it is important to clear up a side matter. Nobody disputes that when Cardinal foreclosed on the property its lien was extinguished and it took the property free and clear of liens. As a participant, Guaranty's rights were derivative of Cardinal's and thus any *lien* it had was also extinguished by the foreclosure. In the ordinary case this would be the end of the matter and Guaranty would have to take an unsecured judgment. However the relationship between the parties was a fiduciary one. The Participation Agreement created a trust, the assets of which may be followed through any change in form.[9] Had a *bona fide* purchaser bought the property at foreclosure the trail might also have ended for Guaranty unless it could trace the cash the trustee received. That was not the case here. Where a trustee takes in the trust property at foreclosure, equity will not allow the trustee to cut off his fiduciary obligations.

A bank which has purchased a loan participation may establish a preferred right of recovery "in situations where the facts are such that the court must say in equity that the property is not that of the bank but that of the claimant." *F.D.I.C. v. Mademoiselle of California*, 379 F.2d 660, 664 (9th Cir.1967), quoting *John L. Walker Co. v. Alden*, 6 F.Supp. 262, 267 (E.D.Ill.1934). *See also Hibernia Nat'l Bank*, 733 F.2d at 1408. In such cases the claimant "has a heavy burden of proof," and must "clearly and certainly" identify the fund from which it seeks to recover. *Hibernia Nat'l Bank*, 733 F.2d at 1408, quoting *Chase Manhattan Bank, N.A. v. F.D.I.C.*, 554 F.Supp. 251, 254 (W.D.Okla.1983). The participating bank must be able to identify a specific fund or payment in the possession of the receiver cognizable in equity as the participating bank's property. *Id.*

For the most part, the tracing in this case is not difficult. The parties had a fiduciary relationship regarding a certain loan participation; this created an equitable trust. The loan was secured by a deed of trust on the subject property and the property itself was the *res* of that trust. At foreclosure the trustee took in the *res*.

---

9. The law is now well settled that as between the *cestui que* trust and trustee ... all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or altered state, continues to be subject to ... the trust.
G. Bogert, *Handbook of the Law of Trusts* § 161 (5th ed.1973).

The trustee subsequently disposed of the trust *res* in exchange for $263,675.00 in cash and $630,825.00 in notes. It is a basic rule that equity will follow trust property through any change in form and thus there is no dispute that the trust continued to attach to the property and followed it through the foreclosure and through the exchange of the *res* at the time of the sale of the condominiums. Cardinal essentially admits as much by agreeing that Guaranty is entitled to a percentage of all "net proceeds" from the sale of the condominium units.

For all that appears, Guaranty was either paid a portion of the amount owing to it from the cash taken from the sales proceeds (the $31,000.00 payment), or else the trustee commingled the cash with its general assets and Guaranty and the other remaining participant received their shares from this commingled fund. In this situation, where commingling has occurred, the tracing requirements are relaxed, *see First Nat'l Bank of Danville v. Commercial Bank & Trust Co.*, 163 Va. 162, 174–175, 175 S.E. 775 (1934), and a trust may be impressed upon all the assets of the trustee. *Id.* However, plaintiff in this case has not requested the imposition of a trust upon the entirety of the receiver's assets but only upon the notes taken in from the ultimate purchasers. Cardinal argues that Guaranty cannot trace into those loans.

Since Cardinal rested without offering any testimony it is difficult to determine precisely what its argument on this point is. Cardinal, over a period of time, exchanged trust property for cash and notes—thus facially there is no impediment to Guaranty's tracing into these notes. Had Cardinal converted the entirety of the trust property into cash, and the cash was still identifiable or available, *see First Nat'l Bank of Danville*, 163 Va. at 175–176, 175 S.E. 775, Cardinal could not argue that Guaranty was unable to trace into the cash. This is implicit in Cardinal's agreement that Guaranty is entitled to a percentage of the net proceeds. Cardinal's argument appears to be that the notes are somehow different in nature from the other proceeds, that they were funded in such a way that Guaranty's chain of equitable ownership has been broken. Reading between the lines, Cardinal implies that it advanced its own funds to the ultimate purchasers, took back notes on these funds and then received the funds back as payment in full for the property; that, in essence, Cardinal received $894,500.00 in cash for the condos. This argument may be disposed of in two fashions.

First, there is no support in the record for Cardinal's argument. The evidence is clear that Cardinal took back $263,675.00 in cash and $630,825.00 in notes from the condo purchasers; nowhere in the record is there any indication that Cardinal took in over $800,000.00 in cash. Cardinal's own officer stated that it took in $263,675.00 in cash and made $630,825.00 in "loans to facilitate" to cover the remainder. The most logical conclusion to be drawn from the record is that a purely paper transaction occurred. Cardinal owned the property, it sold the property and took back notes; no funds were advanced except in the most theoretical sense. In the same way that a homeowner who sells her home to a purchaser in exchange for a note may be said to have "advanced funds" to the purchaser, though clearly none were, so may Cardinal be said to have advanced funds. In reality no funds were advanced or received; Cardinal merely exchanged trust property for notes. Guaranty may trace through this simple transaction with ease.

Cardinal seems to use the fact that $675,000.00 was paid to the other remaining participant to imply that there were liquid net proceeds from the sales in an amount almost equal to the $804,168.42 in net proceeds. However, it is equally probable to assume that this money was paid out of other assets belonging to Cardinal.

The second answer to Cardinal's argument that it may have used other assets to fund the notes is simply that, in equity, it is irrelevant. A trustee owes fiduciary obligations to the beneficiaries of the trust. By advancing personal funds to a third party to finance the purchase of trust property and taking back a note for those funds the trustee cannot extinguish the trust.

He has merely exchanged trust property in one form for trust property in another form, and equity will ignore the change in form. The question is whether "the court must say in equity that the property is not that of the bank but that of the claimant." *Mademoiselle of California,* 379 F.2d at 664. In a purely legal sense Cardinal may have funded the purchase with nontrust funds and thus legally be the owner. However, in equity, the court must say that the notes still belong to Guaranty.

Having concluded that Guaranty is a secured creditor which may recover its judgment from the proceeds of the notes on the condominiums the remaining issue is the amount of its damages.

### B. *Damages*

■ As in any contract case the plaintiff must look to the language of the contract to determine the measure of damages. Guaranty makes several arguments as to the quantum of damages, however none of these is supported by the agreement between the parties. The Service Agreement makes it clear that Guaranty, both before and after foreclosure, is entitled to its percentage of only those amounts *actually collected* by Cardinal. There is no support in the documents for Guaranty's argument that it is entitled to any interest payments other than those which it has already received since Paragraph 4 of the Service Agreement specifically limits Guaranty to a percentage of those amounts "actually collected." The same is true of principal payments as well under Paragraph 4. Thus, there is no basis for Guaranty's argument that it is entitled to recover the full amount of the shortfall between the amount it paid out and the amount of principal it ultimately received. It does not appear to the court that any of the rules of equity require any modification of the contract language.

#### 1. *Pre-foreclosure* damages.

■ Cardinal collected $85,000.00 in lender points during the life of the loan. Under the terms of paragraph 4 of the Service Agreement, Guaranty was entitled to its percentage of these points—$10,-000.00 (11.7647 × 85,000.00). Cardinal does not dispute that this amount was collected, or that Guaranty was not paid its proportion. Accordingly, the court finds that Guaranty is entitled to judgment against Cardinal in the amount of $10,-000.00 for lender points.

#### 2. *Post-foreclosure* damages.

■ After foreclosure Cardinal was able to sell the remaining condominiums, yielding net proceeds in the amount of $804,-168.42. It is undisputed that Guaranty was entitled to 11.7647% of this amount, or $94,-608.00. Guaranty was subsequently paid $31,000.00 of this amount but it was never paid the difference. Accordingly, the court finds that Guaranty is entitled to judgment against Cardinal in the amount of $63,-608.00 for principal collected by Cardinal but never paid over to Guaranty.

After foreclosure a deficiency remained and Cardinal executed a deficiency note with the principals of Area Corporation. Under this note Cardinal collected $126,-215.26. It is undisputed that none of this money was paid over to Guaranty. Accordingly, the court finds that Guaranty is entitled to judgment against Cardinal in the amount of $8,950.55 for amounts collected under the deficiency note but never paid over to Guaranty.

### III

In summary, Guaranty is entitled to judgment in the total amount of $82,558.55. Guaranty is a secured creditor of Cardinal and may have its debt satisfied out of the notes Cardinal holds on the sale of the foreclosed condominiums.

An appropriate Order shall this day issue.